# NO. 12-14-00331-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *JAY TONY RACKLEY,*<br>*APPELLANT* | § | *APPEAL FROM THE 392ND* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *HENDERSON COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Jay Tony Rackley appeals his conviction for indecency with a child, for which he was sentenced to imprisonment for fifteen years. Appellant raises five issues on appeal. We affirm.

## BACKGROUND

Appellant was charged with two counts of aggravated sexual assault of a child and one count of indecency with a child. The State abandoned the aggravated sexual assault charges as well as an enhancement paragraph, and Appellant pleaded "not guilty" to the indecency charge.

The matter proceeded to a bench trial. At trial, C.R., Appellant's daughter and alleged victim, testified. The State called additional witnesses, and Appellant rested without calling any witnesses. Ultimately, the trial court found Appellant "guilty" of indecency with a child and sentenced him to imprisonment for fifteen years. This appeal followed.

## HEARSAY

In his first issue, Appellant argues that the trial court abused its discretion by allowing Cheron Dyer, who was not an outcry witness,[1] to testify concerning statements C.R. made to her

---

[1] Dyer was not an outcry witness, because C.R. was sixteen years old at the time of the alleged crime. As a result, the outcry statute does not apply and any testimony by her recounting C.R.'s statements would be inadmissible as hearsay. *See* TEX. CODE CRIM. PROC. ANN. art. 38.072 (West Supp. 2015).

about the alleged offense. At trial, the State questioned Dyer concerning C.R.'s demeanor and behavior. However, the State did not question Dyer concerning what C.R. said to her. On cross examination, Appellant questioned Dyer about the written statement she made to the Anderson County Sheriff's Department that same day. Specifically, Dyer testified, in pertinent part, as follows:

Q. Ms. Dyer, . . . [y]ou wrote a statement, did you not, for the police; is that correct?
A. Yes, ma'am.

Q. And that was on September 1st whenever y'all reported this?
A. Yes, ma'am.

Q. And with regard to that, you basically told the police what [C.R.] had told you had happened; is that correct?
A. On that day, yes. That was what I was instructed to do was to tell them what had occurred.

Q. Did she tell you, as you recounted in your statement, that [Appellant] held her down during the assault on August 30th?
A. I believe so at one time, yes.

Q. And she told you that she was pretending like that she was asleep during this time period on August 30th; is that correct?
A. Yes. She told me she tried to act like she was asleep.

Q. Do you know or can you think of any reason if she was pretending like she was asleep that [Appellant] would need to hold her down?
A. She said she woke up or she pretended to act like she woke up at one time so she could get him to stop.

Q. And did she tell you that, as you recounted in your statement here on September 1st, that [Appellant] had ejaculated on her?
A. Yes.

Q. And did she also tell you that she had wiped that off of herself with a pair of shorts that was still in her room?
A. She said that she had picked up what she believed was a pair of shorts and used that, yes.

Thereafter, the State's redirect examination transpired, in pertinent part, as follows:

Q. [Appellant's attorney] asked you some questions about the statement that you wrote.
A. Yes.

Q. Do you remember giving that statement?
A. Yes.

Q. In the statement you included things that [C.R.] had told you that night; is that right?
A. Yes, ma'am.

Q. Did you write in your statement that you had asked [C.R.] if she needed to talk?

A. Yes.

Q. And what did [C.R.] tell you?
A. That yes.

Q. You said you went back into the back bedroom; is that correct?
A. Yes, ma'am.

Q. Did [C.R.] tell you that on Thursday night, August 30th, her dad had come into her room and asked her if he could lay down beside her?

[APPELLANT'S ATTORNEY]: Objection. Hearsay.

[PROSECUTING ATTORNEY]: Judge, under the rule of optional completeness, the door has been opened by [Appellant's attorney] who asked specific questions about what [C.R.] said to her and what she wrote in her statement.

THE COURT: Response?

[APPELLANT'S ATTORNEY]: I don't think she asked specific questions. She mentioned the -- described an outcry but not specific questions as to particulars within the statement is my recollection, Your Honor.

[PROSECUTING ATTORNEY]: Judge, there were specific questions asked by [Appellant's attorney], What did [C.R.] tell you? Did [C.R.] tell you this? Did [C.R.] tell you this? Those are all things included within the statement.

THE COURT: Overruled.

Q. (BY [PROSECUTING ATTORNEY]) Did [C.R.] tell you that on Thursday night, August 30th, her dad had come into her room and asked if he could lay down beside her?
A. Yes.

Q. Did [C.R.] tell you that night that she told him that his girlfriend would be home soon?
A. Yes.

Q. Where did [C.R.] tell you that he touched her?
A. He told her -- told me he touched her buttocks and her genitals.

Q. And what did [C.R.] say he used to touch her on her genitals?
A. His fingers and his mouth.

Q. [Appellant's attorney] asked you if [C.R.] told you if she acted like she was asleep; is that correct?
A. Yes.

Q. Did she tell you that she acted to him like she had woke up and that's when she saw that he was naked?
A. Yes.

Q. Did she tell you that she cried herself to sleep and then woke up about an hour later by him saying he was sorry?
A. Yes.

Q. [Appellant's attorney] asked you, also, why you were concerned about [C.R.] enough to talk to her about what was going on in her home. Do you remember that question?

A. Yes.

Q. And you said it was because of the physical altercation.
A. Initially, yes.

Q. You said you saw the bruise on the back of her head.
A. Uh-huh.

THE COURT: If you'll answer "yes" or "no," please.
A. Yes. Sorry.

Q. (BY PROSECUTING ATTORNEY) And how did you see the bruise on the back of her head?
A. She said that he had struck her on her head and had left a bruise and she pulled up her hair and showed it to me.

Q. How would you describe the bruise? Was it a little bruise, a big bruise?
A. It was about quarter size.
Q. And was it blue or yellow or how would you describe it?
A. It was a greenish yellow.

Q. Do you remember about when that was?
A. When I asked her, she said that it happened a couple of days prior because I asked her why she didn't say anything.

Q. Do you remember when it was that you saw the bruise?
A. No.

Q. Why didn't you do anything about that?
A. She stressed to me that she didn't have anywhere to go and that she was fearful that she would be placed in foster care. And at that time I expressed to her that I was very concerned about her safety and welfare and that, you know, we could see what we could -- who we could speak to see about what she could do where it wouldn't have to be a foster home, but I didn't want her staying where she wasn't comfortable.

We review a trial court's decision to admit evidence under an abuse of discretion standard. *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005). The trial court abuses its discretion only when the decision lies "outside the zone of reasonable disagreement." *Id.* Hearsay statements are generally not admissible unless the statement falls within a recognized exception to the hearsay rule. *Mick v. State*, 256 S.W.3d 828, 831 (Tex App.–Texarkana 2008, no pet.). Texas Rule of Evidence 107, the rule of optional completeness, is one such rule. *Id.*

Rule 107 states, in pertinent part, as follows:

If a party introduces part of an act, declaration, conversation, writing, or recorded statement, an adverse party may inquire into any other part on the same subject. An adverse party may also introduce any other act, declaration, conversation, writing, or recorded statement that is necessary to explain or allow the trier of fact to fully understand the part offered by the opponent.

4

TEX. R. EVID. 107. This rule is one of admissibility and permits the introduction of otherwise inadmissible evidence when that evidence is necessary to fully and fairly explain a matter "opened up" by the adverse party. *Walters v. State*, 247 S.W.3d 204, 217-18 (Tex. Crim. App. 2007). It is designed to reduce the possibility of the jury's receiving a false impression from hearing only a part of some act, conversation, or writing. *Id.* Rule 107 does not permit the introduction of other similar, but inadmissible, evidence unless it is necessary to explain properly admitted evidence. *Mick*, 256 S.W.3d at 831. Further, the rule is not invoked by the mere reference to a document, statement, or act. *Id.*[2]

Here, in his cross examination of Dyer, Appellant sought specific details from her about C.R.'s outcry. Specifically, Appellant questioned Dyer regarding the details of C.R.'s statement about Appellant's alleged improper conduct toward her. These questions left open the possibility that the trier of fact would receive a false impression—that C.R. fabricated the allegations since there was a potential inconsistency with her story regarding why Appellant needed to hold her down if she was feigning sleep. Therefore, we conclude that for the trier of fact to fully understand the context of C.R.'s conversation with Dyer as recorded in Dyer's statement and, further, to better determine whether C.R. was credible, the trial court appropriately permitted the State to question Dyer concerning the remainder of her statement.[3] Accordingly, we hold that the trial court did not abuse its discretion in admitting Dyer's testimony. Appellant's first issue is overruled.

## TESTIMONY CONCERNING VICTIM'S TRUTHFULNESS

In his second issue, Appellant argues that the trial court abused its discretion by admitting testimony from Forensic Interviewer Sheila Durden concerning C.R.'s truthfulness.

An expert is not permitted to give an opinion that the complainant or a class of persons to which the complainant belongs (such as child sexual assault victims) is truthful. *Johnson v. State*, 432 S.W.3d 552, 557 (Tex. App.–Texarkana 2014, pet. ref'd) (citing *Yount v. State*, 872

---

[2] The use of the rule is further limited by Rule 403, which permits a trial court to exclude otherwise relevant evidence if its unfair prejudicial effect or its likelihood of confusing the issues substantially outweighs its probative value. *Mick*, 256 S.W.3d at 831 n.4.

[3] Appellant does not argue on appeal that Dyer's testimony concerning her statement related to any extraneous offense or that it was unduly prejudicial to him.

S.W.2d 706, 712 (Tex. Crim. App. 1993)). Instead, jurors must draw "conclusions concerning the credibility of the parties in issue." *See Johnson*, 432 S.W.3d at 557 (citing *Yount*, 872 S.W.2d at 710); *see also Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) ("[T]he jury is the sole judge of the witnesses' credibility and the weight to be given their testimony.").

In the instant case, the following exchange occurred during the State's examination of Durden.

> Q. And although you're not here to testify to the truthfulness of [C.R.], her behavior during the disclosure in regards to her crying and her demeanor, were those consistent with someone who had been sexually abused?
>
> [APPELLANT'S COUNSEL]: Objection. Bolstering and goes to truthfulness.
>
> [PROSECUTING ATTORNEY]: Judge, I'm not asking whether or not the child is telling the truth. In fact, there's case law that specifically allows for that question. Behavior of a child who has been sexually abused, whether or not it's consistent or not consistent, is admissible.
>
> THE COURT: Overruled.
>
> Q. (BY [PROSECUTING ATTORNEY]): Do you need me to ask that again?
> A. Yes, I do.
>
> Q. Would you say that [C.R.]'s behavior and demeanor in regards to her crying during her disclosure would be consistent with a child who had been sexually abused?
> A. Yes, ma'am.

An expert witness may testify that the expert has observed a child exhibit behaviors that are consistent with child sexual abuse or some other traumatic event. *Long v. State*, No. 12-07-00256-CR, 2008 WL 5050099, at *4 (Tex. App.–Tyler Nov. 26, 2008, no pet.) (citing *Cohn v. State*, 849 S.W.2d 817, 820 (Tex. Crim. App. 1993)). Evidence of nonsexual behaviors, which are commonly observed in sexually abused children, is admissible to show that the children have suffered from "some traumatic event." *See Long*, 2008 WL 5050099, at *4; *Cohn*, 849 S.W.2d at 819. This sort of testimony might indirectly serve to buttress the proof that the child was sexually assaulted, but it is not admitted for that purpose. *See Long*, 2008 WL 5050099, at *4.

Here, the prosecuting attorney's question specifically informed Durden and the trial court that Durden was not there to testify concerning C.R.'s truthfulness. Rather, she asked Durden whether C.R.'s "behavior during the disclosure[, i.e.] her crying and her demeanor, [was] consistent with someone who had been sexually abused." This question was not improper. *See*

***Cohn***, 849 S.W.2d at 820; ***Long***, 2008 WL 5050099, at *4.  Therefore, we hold that the trial court did not abuse its discretion in overruling Appellant's objection to it.  Appellant's second issue is overruled.


**HEARSAY**

In his third issue, Appellant argues that the trial court abused its discretion when it allowed C.R.'s counselor, Summer Wilson, to testify about hearsay statements C.R. made to her.  At trial, Appellant objected to the admission of Wilson's report, which contained a two page narrative written by C.R. concerning the conduct in which Appellant was alleged to have engaged.

**Standard of Review and Governing Law**

"A trial judge's decision on the admissibility of evidence is reviewed under an abuse of discretion standard and will not be reversed if it is within the zone of reasonable disagreement." ***Franklin v. State***, 459 S.W.3d 670, 675 (Tex. App.–Texarkana 2015, pet. ref'd).

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  TEX. R. EVID. 801(d).  "Hearsay is not admissible except as provided by statute or [the Rules of Evidence] or by other rules prescribed pursuant to statutory authority."  TEX. R. EVID. 802.  There is no question that Wilson's report included hearsay; the question is whether the hearsay was admissible.  Here, Appellant made a hearsay objection. "Once the opponent of hearsay evidence makes the proper objection, it becomes the burden of the proponent of the evidence to establish that an exception applies that would make the evidence admissible in spite of its hearsay character." ***Taylor v. State***, 268 S.W.3d 571, 578–79 (Tex. Crim. App. 2008).

The State specifically informed the trial court that it relied on Texas Rule of Evidence 803(4), an exception that allows for the admission of qualifying hearsay statements.  Rule 803(4) provides as follows:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
> . . . .
>
> (4) Statements for Purposes of Medical Diagnosis or Treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain,

7

or sensations, or the inception or general character of the cause or eternal source thereof insofar as reasonably pertinent to diagnosis or treatment.

TEX. R. EVID. 803(4). This exception is based on the assumption that the patient understands the importance of being truthful with the medical personnel involved to receive an accurate diagnosis and treatment. *Franklin*, 459 S.W.3d at 676; *see Taylor*, 268 S.W.3d at 580. Moreover, the witness relating the out-of-court statement made for purpose of diagnosis or treatment need not be a physician for the statement to be admissible. *See Taylor*, 268 S.W.3d at 584. As long as the statement at issue otherwise met the criteria of the rule, courts have held that a statement identifying the perpetrator is admissible when psychologists, therapists, licensed professional counselors, or, under some circumstances, social workers. *See id.*

In *Taylor*, the court looked to federal cases involving Rule 803(4) to determine how to apply the law to nonmedical professionals. *See id.* at 579. In examining several federal cases, the court noted that more recent Eighth Circuit holdings emphasized the requirement that the record reflect, in cases involving child victims, both (1) that the physician (or counselor or psychologist) explained the importance of knowing the true identity of the assailant to the efficacy of the diagnosis or treatment and (2) that the child manifested an understanding of the need to be truthful. *See id.* at 582. The court agreed that consistent with the rationale for admitting statements made for purposes of medical diagnosis or treatment over a hearsay objection, it is appropriate to require the proponent of the evidence to show that (1) the out-of-court declarant was aware that the statements were made for that purpose and (2) "proper diagnosis or treatment depends upon the veracity of such statements." *Id.* at 588–89.

**Application of Rule 803(4)**

To determine whether a child understands the importance of truthfulness when speaking to medical personnel, the reviewing court looks to the entire record. *See Green v. State*, 191 S.W.3d 888, 896 (Tex. App.–Houston [14th Dist.] 2006, pet. ref'd). Although *Taylor* requires some showing that the declarant was made aware that proper diagnosis or treatment depended on the veracity of her statement, the method of meeting the requirement differs depending on whether the statement was made to a medical or nonmedical professional, as expressed in the following excerpt.

Still, we recognize that reclining on a therapist's or psychiatrist's couch is not quite the same as sitting in the emergency room in the immediate aftermath of an injury or on the

8

physician's cold examination table in the interest of diagnosing and curing some exigent disease or ailment. In the latter contexts, it seems only natural to presume that adults, and even children of a sufficient age or apparent maturity, will have an implicit awareness that the doctor's questions are designed to elicit accurate information and that veracity will serve their best interest. This explains the almost universal tendency of courts under these circumstances to assay the record, not for evidence of such an awareness, but for any evidence that would negate such an awareness, even while recognizing that the burden is on the proponent of the hearsay to show that the Rule 803(4) exception applies.

In the therapist's office, however, this tacit presumption is far less compelling. It is not always so readily apparent (indeed, it may not always be accurate) in the mental-health context that truth-telling is vital. Not even an older, more mature child (maybe not even an adult) will necessarily recognize and appreciate the necessity (assuming there is a necessity) always to tell a mental-health provider the truth in order to assure the efficacy of treatment. In this context we think it is incumbent upon the proponent of the hearsay exception to make the record reflect both (1) that truth-telling was a vital component of the particular course of therapy or treatment involved, and (2) that it is readily apparent that the child-declarant was aware that this was the case. Otherwise, the justification for admitting the out-of-court statement over a valid hearsay objection is simply too tenuous.

*Taylor*, 268 S.W.3d at 589–90 (footnotes omitted). Thus, unlike statements made to medical professionals, we may not infer from the record that the victim knew it was important to tell the nonmedical professional the truth in order to obtain treatment or diagnosis. *Cf. Franklin*, 459 S.W.3d at 677. Rather, we require affirmative evidence in the record on the issue of veracity. *Cf. id.*

Here, Wilson testified that she is a clinical psychotherapist with a practice focused toward child trauma, addiction, attachment, and family therapy. Wilson further testified as follows:

Q. Do you ever try to consider what kind of diagnosis or how to treat the child at that first visit?
A. Yes. That's part of what I do at every visit is continually assess for what the current symptomology (sic) may be and what the best treatment intervention for that particular session may be.

Q. Is it important for your client and for [C.R.], in this case, to tell you the truth so you can properly treat and diagnose?
A. Absolutely.

Q. And do you let [C.R.] know that it was important?
A. Absolutely.

Q. Do you do that in every interview?
A. Yes.

Q. Every child therapy session?
A. The very first one and sometimes the second and the third.

Q. Do you go over the goals for treatment for [C.R.]?

A. Yes.

Q. And is it pertinent for you to know not only what happened but who the perpetrator is in order for you to treat [C.R.]?
A. Yes.

Q. Why is that?
A. In trauma in particular, it's knowing who the potential offender is that correlates the level of trauma or the intensity of trauma and also predicates whether or not there's a dual relationship, if it's a family member or they're a friend or a stranger. So it makes a significant difference in the types of interventions that are used. It also makes a difference in the types of symptomologies (sic) that may arise. And so it's very helpful for me to know if they know who the offender is from the very beginning.

Q. And you said if the offender is related. [C.R.] made an outcry against her biological dad; is that correct?
A. Correct.

Q. In your treatment or your goal as a counselor, are you going to go over a safety plan because it's someone that is related to [C.R.]?
A. I do go over a safety plan. I also go over the plan that's usually typically in place by some other agency or entity or family. So I hear about that. Then I begin to ask ancillary questions just to see where there might be some areas that I could help with.

Q. What was your treatment goal for [C.R.]?

. . . .

A. This case was unique in that at the first visit [C.R.] had made it known that she wasn't sure where she may be staying, that there was some controversy about placement and there were a handful -- a few family members and then a friend who were all in communication with who she's going to stay with. And so at that particular visit, the fundamental safety question was where is she going to sleep. And so we spent quite a bit of time -- I spent quite a bit of time asking her questions about the different dynamics in each of the potential locations so that I would have some idea of what she may be dealing with on top of the trauma. I knew she wasn't going to go to where she was calling home. And the fact that she may be very transitional for a day here, two days here, three days here, can actually add to the traumatic stress. And so it was really important for me to find these things out.

Q. With [C.R.], did you see signs of depression?
A. I did, yes.

Q. Was your goal to also treat that sign of depression?
A. Yes.

Q. Was [C.R.] aware that what she told you would help you to treat that depression and to treat -- to have a safety plan?
A. [C.R.] like most folks that come in my office, although they know or they're told -- they don't necessarily believe the first session that they need to say these things; they certainly don't want to talk about these things -- but she did. Her symptoms became biological in nature in that counseling alone and stable environment alone were not resolving a lot of her symptoms of depression and so it did become necessary for us to really talk about not only is counseling going to be a part of this but medication as well.

. . . .

Q. And . . . she understood that in writing that [narrative] that it would be helpful for her diagnosis and her treatment to you; is that correct?

A. Yes. This is actually what's referred to as a trauma narrative. And in the protocol for the evidence-based interventions of trauma-focused cognitive behavioral therapy, this is actually step number four out of [fifteen]. And so it is part of the process. And she knew that that was what's going on.

Based on our review of the record, we conclude that (1) Wilson explained the importance of knowing the true identity of C.R.'s assailant to the efficacy of the diagnosis or treatment, (2) she conveyed that proper diagnosis or treatment depends upon the veracity of statements such as the one at issue, (3) she emphasized to C.R. the importance of telling the truth during counseling sessions, (4) C.R. manifested to Wilson that she understood the necessity of her being truthful, and (5) C.R. understood that writing the narrative would be helpful for her diagnosis and treatment by Wilson.[4] Accordingly, we conclude that the trial court did not abuse its discretion in finding that the statements contained within Wilson's notes, as well as her testimony at trial, were admissible under Rule 803(4). Appellant's third issue is overruled.

### VICTIM IMPACT TESTIMONY

In his fourth issue, Appellant argues that the trial court abused its discretion in permitting C.R. to give "victim impact testimony" during the guilt-innocence phase of trial. Specifically, Appellant objected to testimony the State sought to elicit from C.R. concerning how she felt about what Appellant did to her, arguing that it "[c]alls for victim impact [testimony]."[5]

"Victim impact evidence" generally is inadmissible during the guilt-innocence phase of trial. *See Petruccelli v. State*, 174 S.W.3d 761, 768 (Tex. App.–Waco 2005), *pet. ref'd*, 184 S.W.3d 747 (Tex. Crim. App. 2006). It is defined as "evidence of the effect of an offense on people *other* than the victim." *Roberts v. State*, 220 S.W.3d 521, 531 (Tex. Crim. App. 2007); *see Mathis v. State*, 67 S.W.3d 918, 928 (Tex. Crim. App. 2002) (testimony not "victim impact" evidence because not about effect on third person).

---

[4] The record reflects that C.R. wrote the narrative at issue approximately eleven months after her initial therapy session. Appellant has not ever argued, and, thus, we do not consider, whether the prolonged period of therapy may have eroded C.R.'s understanding of the importance of her telling the truth. However, we note that there is no indication in the record that there was any such erosion of her understanding concerning the necessity for veracity.

[5] Appellant did not make a relevance objection at trial and has made no such an argument on appeal.

Here, Appellant objected to C.R.'s testifying about the effect Appellant's conduct had on *her*, i.e., her feelings about it and her subsequently suffering from nightmares and post-traumatic stress disorder. Because the complained-of testimony did not concern the effect of the offense on people other than C.R., it is not victim impact testimony. Therefore, we hold that the trial court did not abuse its discretion by overruling Appellant's objection on that ground. Appellant's fourth issue is overruled.

**EVIDENTIARY SUFFICIENCY**

In his fifth issue, Appellant argues that the evidence is insufficient to support his conviction of indecency with a child.

**Standard of Review and Governing Law**

The *Jackson v. Virginia*[6] legal sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the state is required to prove beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). Legal sufficiency is the constitutional minimum required by the Due Process Clause of the Fourteenth Amendment to sustain a criminal conviction. *See Jackson*, 443 U.S. at 315–16, 99 S. Ct. at 2786–87; *see also Escobedo v. State*, 6 S.W.3d 1, 6 (Tex. App.–San Antonio 1999, pet. ref'd). The standard for reviewing a legal sufficiency challenge is whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 320, 99 S. Ct. at 2789; *see also Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). A successful legal sufficiency challenge will result in rendition of an acquittal by the reviewing court. *See Tibbs v. Florida*, 457 U.S. 31, 41–42, 102 S. Ct. 2211, 2217–18, 72 L. Ed. 2d 652 (1982).

A factfinder may accept one version of the facts and reject another, and it may accept part of a witness's testimony, but reject another. *See Jones v. State*, 428 S.W.3d 163, 168 (Tex. App.–Houston [1st Dist.] 2014, no pet.); *see also Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Henderson v. State*, 29 S.W.3d 616, 623 (Tex. App.–Houston [1st Dist.] 2000, pet. ref'd) (stating jury can choose to disbelieve witness even when witness's testimony is uncontradicted). We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim.

---

[6] 443 U.S. 307, 315–16, 99 S. Ct. 2781, 2786–87, 61 L. Ed. 2d 560 (1979).

App. 2007). We afford almost complete deference to the factfinder's credibility determinations. *See Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and, therefore, defer to that determination.").

An individual is guilty of indecency with a child if he engages in sexual contact with a child younger than seventeen years of age. *See* TEX. PENAL CODE ANN. § 21.11(a)(1) (West 2011). Under Section 21.11, a person engages in "sexual contact" if he, with the intent to arouse or gratify the sexual desire of any person, touches, either directly or through clothing, the anus, breast, or any part of the genitals of a child. *See id.* § 21.11(c)(1). The factfinder can infer the requisite intent to arouse or gratify the sexual desire from conduct, remarks, or all the surrounding circumstances. *Scott v. State*, 202 S.W.3d 405, 408 (Tex. App.–Texarkana 2006, pet. ref'd). The intent to arouse or gratify may be inferred from conduct alone. *Id.* No oral expression of intent or visible evidence of sexual arousal is necessary. *Id.*

## Evidence Supporting Indecency with a Child

Here, C.R. testified in pertinent part that Appellant touched her breasts and vagina when she was sixteen years old. C.R. further testified that Appellant put his finger in her vagina and put his mouth on her "butt" and her vagina. C.R. stated that Appellant had removed her pants and was not wearing any clothes as he rubbed his genitals against her from behind. C.R. further stated that Appellant had an erection, was masturbating, and ejaculated on her buttocks. C.R. also testified that she wiped off his ejaculate with the pair of shorts she had been wearing.

Appellant first argues C.R.'s testimony is not sufficiently corroborated. However, a child sexual abuse victim's uncorroborated testimony is sufficient to support a conviction for indecency with a child. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07 (West Supp. 2015); *Jones*, 428 S.W.3d at 169; *see also Martinez v. State*, 178 S.W.3d 806, 814 (Tex. Crim. App. 2005) (noting that Article 38.07 "deals with the sufficiency of evidence required to sustain a conviction for" certain sexual offenses). The state has no burden to produce any corroborating or physical evidence. *Martines v. State*, 371 S.W.3d 232, 240 (Tex. App.–Houston [1st Dist.] 2011, no pet.); *see also Lee v. State*, 176 S.W.3d 452, 458 (Tex. App.–Houston [1st Dist.] 2004), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006) (holding that medical or physical evidence not required

to corroborate child victim's testimony). Thus, we conclude that Appellant's argument is unsupported in the law.

Appellant further argues that when C.R.'s testimony is compared to the contradictory scientific evidence,[7] her credibility is called into question. However, we stress that we may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the factfinder. *See **Williams***, 235 S.W.3d at 750.

Courts give wide latitude to testimony provided by child victims of sexual abuse. ***Jones***, 428 S.W.3d at 169; ***Gonzalez Soto v. State***, 267 S.W.3d 327, 332 (Tex. App.–Corpus Christi 2008, no pet.). We liberally construe this testimony, and, as long as the child communicates to the factfinder that the touching occurred on a part of the body within the definition of the statute, the evidence will be sufficient. *See **Jones***, 428 S.W.3d at 169; ***Lee***, 176 S.W.3d at 457. The requisite intent for the offense of indecency with a child can be inferred from the defendant's conduct and remarks and all of the surrounding circumstances. *See **Gonzalez Soto***, 267 S.W.3d at 332; ***Navarro v. State***, 241 S.W.3d 77, 79 (Tex. App.–Houston [1st Dist.] 2007, pet. ref'd).

Having reviewed the record in a light most favorable to the trial court's verdict, we conclude that the trial court reasonably could have found beyond a reasonable doubt that Appellant engaged in sexual contact with C.R.'s vagina. Therefore, we hold that the evidence is legally sufficient to support the trial court's verdict. Appellant's fifth issue is overruled.

## DISPOSITION

Having overruled Appellant's first, second, third, fourth, and fifth issues, we ***affirm*** the trial court's judgment.

**BRIAN HOYLE**
Justice

Opinion delivered December 16, 2015.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)

---

[7] The evidence reflects that no semen specimen was recovered from the shorts collected from the home.



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**DECEMBER 16, 2015**

**NO. 12-14-00331-CR**

**JAY TONY RACKLEY,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 392nd District Court
of Henderson County, Texas (Tr.Ct.No. B-20,700)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*